# AFFIDAVIT

I, Philip Jones, being duly sworn, hereby depose and state that the following is true to the best of my information, knowledge, and belief:

## INTRODUCTION AND AGENT BACKROUND

1. I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") and have been since January 2015. As part of my duties, I investigate criminal violations relating to child exploitation and sex assaults. I served approximately one year as an Airport Liaison Agent assigned to Denver International Airport, and during this assignment I investigated sex and physical assaults occurring aboard aircraft, among other violations occurring in the special territorial jurisdiction of the United States.  I have received training, instruction and practical experience in the field of investigation relating to a wide variety of violations of federal statute.

2. This affidavit is submitted in support of an application for a search warrant for a cellular telephone (more fully described in Attachment A), and the data located therein, there being probable cause to believe that located in the place described in Attachment A are items described in Attachment B, being evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Section 2244(b).

3. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation.  I have set forth facts that I believe are necessary to establish probable cause to believe that evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Section 2244(b) are located in the place described in Attachment A.

4. The information contained within the affidavit is based on my training and experience, as well as information imparted to me by other law enforcement officers involved in this investigation.

## RELEVANT STATUTE

5. This investigation concerns an alleged violation of 18 U.S.C. Section 2244(b), relating to unlawful sexual contact.

6. Title 18, U.S.C. Section 2244(b) prohibits a person from knowingly engaging in sexual contact with another person without that person's permission while in the special territorial jurisdiction of the United States.

7. Title 18, U.S.C. Section 7, coupled with Title, 49 U.S.C. Section 46506, define "special territorial jurisdiction of the United States" to include illegal acts committed aboard a foreign-owned vessel or airline.

## DEFINITIONS

8. The following definitions apply to this Affidavit and Attachment B to this Affidavit.

    A. "Chat" refers to any kind of communication over the Internet that offers a real-time transmission of text messages from sender to receiver.  Chat messages are generally short in

       order to enable other participants to respond quickly and in a format that resembles an oral conversation. This feature distinguishes chatting from other text-based online communications such as Internet forums and email.

B. The "Internet" is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

C. "Internet Service Providers" ("ISPs"), as used herein, are commercial organizations that are in business to provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment. ISPs can offer a range of options in providing access to the Internet including telephone based dial-up, broadband based access via digital subscriber line ("DSL") or cable television, dedicated circuits, or satellite based subscription. ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, which the connection supports. Many ISPs assign each subscriber an account name – a user name or screen name, an "e-mail address," an e-mail mailbox, and a personal password selected by the subscriber. By using a computer equipped with a modem, the subscriber can establish communication with an Internet Service Provider ("ISP") over a telephone line, through a cable system or via satellite, and can access the Internet by using his or her account name and personal password.

D. "Internet Protocol address" or "IP address" refers to a unique number used by a computer to access the Internet. ISPs assign IP addresses to physical addresses that have Internet access. IP addresses can be "dynamic," meaning that the ISP assigns a different unique number to a computer every time it accesses the Internet. IP addresses might also be "static," if an ISP assigns a user's computer a particular IP address which is used each time the computer accesses the Internet. IP addresses are also used by computer servers, including web servers, to communicate with other computers.

E. "Records" and "information" include items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data).

**IDENTIFICATION OF THE DEVICE TO BE SEARCHED AND SEIZED**

9. A cellular telephone utilized by and currently in the possession of Dakota Heller, assigned the number 720-454-7854, service provider T-Mobile, referred to hereinafter and in Attachments A2 and B as the "Device." The Device is believed to be an iPhone based on observations made by a person familiar with Heller's device, later identified in this affidavit as FAMILY MEMBER.

10. I believe there is probable cause to believe that the Device is or contains evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Section 2244(b). The applied-for warrant would authorize the seizure and the forensic examination of the Device for the purpose of identifying electronically stored data particularly described in Attachment B.

## IDENTIFICATION OF THE LOCATION TO BE SEARCHED

11. Based on information from witnesses, from Heller himself, and from my surveillance, I understand that Heller is currently residing with his mother, at 569 Ten Gallon Drive, Berthoud, Colorado, hereinafter “Subject Residence.” It is a single family residence with no known areas that may be inaccessible to Heller.

12. Heller’s daily schedule is not predictable as he is self-employed in the home improvement industry. I have conducted checks at the Subject Residence, to include, but not limited to, April 14, April 29, May 2, 2019, May 5, 2019 and May 6, 2019. On each occasion, which occurred at different times of day, I observed Heller’s vehicle, a 2017 Black Hyundai Tucson, Colorado license plate ROK-932, parked in the driveway.

13. As detailed below, Heller has demonstrated a propensity to maintain the Device on or near his person at different times of day. Should Heller be determined to be in Subject Residence, it would be reasonable to believe that the Device would also be located in Subject Residence based on my experience that most individuals store their cellular devices on or near their person if they are in their home. I therefore request this search warrant authorize executing agents to enter and search the Subject Residence (described on Attachment A1) for the limited purpose of seizing the Device, described on Attachment A2.

## INVESTIGATION

### BACKGROUND AND VIOLATION

14. The United States is investigating unlawful sexual contact that occurred aboard an aircraft en route from the United Arab Emirates to Seattle, Washington on April 3, 2017. The victim, a male hereinafter referred to as MINOR 1[1], was 16 years old at the time of the contact.

15. On April 3, 2017, Dakota Heller was seated next to MINOR 1 on Air Emirates flight EK 229 en route from Dubai, United Arab Emirates to Seattle, Washington. Heller, MINOR 1 and other individuals were returning from Uganda following a church-sponsored mission trip. Heller and MINOR 1 had known each other for a period of a couple years prior to this date.

16. During this flight, MINOR 1 and Heller were seated on the port side of the aircraft. Heller was seated in the aisle seat, MINOR 1 in the center seat, and another church member in the window seat.

17. MINOR 1 took Ambien he had been provided during the flight and fell asleep. At some point during the flight, MINOR 1 partially awoke and recognized that a blanket had been placed over both his and Heller’s laps. Heller moved his hand under the blanket, placed his hand on MINOR 1’s thigh, and proceeded to move his hand up to MINOR 1’s groin. Heller unbuttoned MINOR 1’s shorts, moved aside MINOR 1’s underwear and proceeded to masturbate MINOR 1 for approximately one to two minutes. During the contact, MINOR 1 observed Heller looking at MINOR 1 in an apparent attempt to gauge MINOR 1’s reaction.

---

[1] MINOR 1’s identity is known to law enforcement, but it is withheld for the purpose of this affidavit as the person was under the age of 18 at the time of the potential violation. The identities of other parties referenced in this affidavit are known, but are similarly withheld to protect their identities and to prevent identification of Minor 1.

18. I have interviewed MINOR 1 and the church member seated next to MINOR 1 while aboard the Air Emirates flight. MINOR 1 recalled receiving Ambien from either the church member seated to his left or from Heller. The church member seated to MINOR 1's left did not have Ambien during this flight as he experienced flight anxiety and would not experiment with prescription drugs on a 15-hour flight; however, he did believe Heller possessed and possibly supplied Ambien to other parties.

19. MINOR 1 did not fully recognize or comprehend what was occurring while Heller was making contact with MINOR 1's genitals until after the contact.

20. While this incident occurred in April 2017, it was not reported until January 13, 2019, at which time MINOR 1 disclosed to FAMILY MEMBER. FAMILY MEMBER then notified multiple law enforcement agencies to include the FBI.

21. MINOR 1 explained the reason for the delay was that MINOR 1 and Heller had discussed the sexual contact on at least two occasions following the flight, and Heller was able to persuade MINOR 1 that disclosing the incident would ruin Heller's life.

**USE OF THE DEVICE**

22. Heller has been observed to have utilized his cellular telephone on multiple instances following the flight and following MINOR 1's disclosure on January 13, 2019. Heller has been observed to communicate via cellular telephone with multiple friends and family members in which he either directly referenced possible criminal activity or alluded to the possibility that he had committed criminal activity, or he is believed to have done so.

**Verbal and Possible Electronic Communication with Harmony Kilgore, Dakota Heller's sister**

23. Following the flight on April 3, 2017, Heller appears to have notified Kilgore of the incident described above. This is evidenced as follows:

    a. Heller posted a video to Facebook on April 6, 2017, in which Heller video recorded himself. The video is publicly available on Heller's Facebook "wall," and it has been preserved by the FBI. During the course of the video, Heller detailed his self-described struggle with homosexuality and explained that he was on an emotional roller coaster following recent events in his life to include witnessing a car accident and his trip to Africa. In the comments section of the video, Kilgore (Heller's sister) posted the following: "I love you Kets. I am glad you have trusted me enough to be someone to lean on.... The truth shall set you free. I am excited for you to start healing and start living YOUR life..." The exact date of this comment is not available, but it appears to have been posted at least one year prior to the date of this Application. The above comment was shortened for the sake of brevity, but it has been maintained in its entirety. Heller posted this video approximately three days after the flight in which the alleged violation occurred.

    b. On January 16, 2019, FAMILY MEMBER, five church members and Heller's mother held a meeting with Heller in which they confronted Heller about MINOR 1's disclosure. This meeting was audio recorded, and a copy of the recording was provided to the FBI. It should be noted that parties present told Heller that they were aware of what he had done, but the specific nature of the accusation was never verbalized nor did Heller directly

      admit that he had reached down MINOR 1's clothing aboard the aircraft. FAMILY MEMBER did, however, tell Heller that he had taken advantage of a 16-year-old, to which Heller responded that he had never done any such thing to anyone "else." During the recording, Heller described sitting on Kilgore's bed for approximately two and a half hours the day after returning home detailing everything that had happened. Heller did not provide specific information about what he discussed with Kilgore during the course of this recording, but Kilgore's comments to a video publicly posted on Heller's Facebook approximately three days after the alleged incident tend to support that Heller told Kilgore about what had occurred with MINOR 1.

   c. On February 14, 2019, I contacted Kilgore for the purpose of arranging an interview. Kilgore acknowledged that Heller had told her details of the "situation." Kilgore then hesitated and requested to call me back in approximately five minutes; however, Kilgore never attempted to contact me afterward. Kilgore is known to reside in Boulder, Colorado, while Heller was living with his mother in Berthoud, Colorado at this time. It is reasonable to believe Kilgore suspended the call in order to contact Heller, and inquire whether she could speak with the FBI. It is also reasonable to believe Kilgore communicated with Heller via cellular telephone on this date due to their geographic separation.

**Telephone Communication with CHURCH MEMBER**

24. The following text messages were exchanged between Heller and CHURCH MEMBER on April 26, 2018:

    CHURCH MEMBER: …Let the pain of your side today hold some deeper meaning.

    Heller: I wish it could. I have such an unhealthy "thing" in my life that I can't let go of and it's destroying me. Again. Shit doesn't end.

    Heller: Nor can I expose it. Doesn't that just blow.

    CHURCH MEMBER: I don't know what to do with that. Except that you are loved no matter what.

    CHURCH MEMBER: You are going to be forever stuck if you don't let go. You have to take steps.

    Heller: Literally would need to be in a mental hospital or worse.

    Heller: It is what it is. [shrugging emoji]

    Heller continued his conversation with CHURCH MEMBER in general terms. While this discussion could be applicable to any of Heller's life circumstances, it does indicate that Heller was aware of potential repercussions for his actions, including what appears to be involuntary commitment as referenced by "mental hospital or worse," should his "unhealthy 'thing'" ever be discovered.

25. Heller possibly clarified this statement during the recorded group meeting on January 16, 2019 when he addressed CHURCH MEMBER with the following:

        I wish I knew a direction to go in, you guys, but honestly, I mean, I wanted to turn my-

       myself in from the very beginning, whether it's jail, whatever it is that-the only way that I could see not taking my own life is if I'm locked behind bars-and if-and that's why I think I even told you that, [CHURCH MEMBER]-and it was in direct relation to this[2].

26. During this meeting Heller repeatedly exclaimed that he was going to jail. He told the group that he would be a registered sex offender for what he had done, that he would not be able to be near kids and that he would not be allowed to have his own children. Heller also commented that he had looked up possible sentences for whatever crime he perceived himself to have committed. The totality of these statements indicate that his perceived crime was directed at a minor, specifically named by Heller as MINOR 1, was sexual in nature, and he provided that the perceived crime had occurred roughly two years prior to the date of this meeting, which was approximately the amount of time since the Air Emirates flight occurred.

**Telephone Communication with MINOR 1**

27. On January 16, 2019, MINOR 1 and Heller, utilizing telephone number 720-454-7854, exchanged the following text messages:

MINOR 1: On another note, I want to talk with you about something

MINOR 1: I wanted to let you know that I am going to hangout with [MINOR 1's girlfriend] tonight. Coming back from Australia, I think I'm going to marry her. And so tonight I was going to tell her about my past including what happened in Uganda

Heller: As far as work goes I can use you the next couple of days. First of all congrats!! That's awesome, I'm super happy for you bro. And, I definitely understand that you gotta do what you gotta do so no problem. I'm happy to talk to her too if necessary, not that I'd have much to say. Thanks for letting me know.

MINOR 1: Ok I'll let you know how it goes. What would you want to say? I'm just super nervous. Idk what she's going to say

Heller: I have no idea either. I made a huge mistake, we talked about it, and we moved on from it. In the end whatever needs to be done I am ok with. You're the person that was hurt in this so it should be whatever you think is best. I am still incredibly sorry I ever even put you in this position but will deal with the consequences of my actions whenever or however they come my way. She's probably going to be very upset, may not want to be in the same house as me, may suggest that someone else needs to be told?! I really don't know?!

MINOR 1: Yeah this sucks

Heller: I'm sorry man. Is there anything I can do to make it easier? I can tell her if you think it'd be better? Is there anything I can do in general to make your life easier? Not just tonight's possible situation but for your well being in general?

MINOR 1: I don't know

[2] This statement by Heller was transcribed into a verbatim transcript of the recorded January 16, 2019 group meeting.

Heller: Well, please let me know if there is anything. Once again, I'm sorry [MINOR 1]. I wish I could take it all back and make it go away.

**Likely Electronic Communication with Rainbow Heller, Dakota Heller's sister**

28. Shortly after this incident was reported to the FBI, I spoke with FAMILY MEMBER in order to schedule an interview time with FAMILY MEMBER and MINOR 1. During this conversation, FAMILY MEMBER told me that Heller was seeking information about how to best turn himself in to law enforcement, and similar statements were captured during the January 16, 2019 recorded meeting in which Heller stated that he wanted to turn himself in and that he would be going to jail. I offered that FAMILY MEMBER provide Heller my telephone number so he may call me to discuss. Heller called me soon thereafter using telephone number 720-454-7854, and I have spoken with Heller via telephone number 720-454-7854 on three separate occasions to include January 18, 2019, January 30, 2019 and February 14, 2019. Heller and I also attempted to communicate via telephone on additional occasions and left each other voice messages, and these communications occurred at multiple times of day. In each instance, Heller explained that he would be willing to speak with the FBI, but he would like to have a lawyer present. Heller stated in earlier conversations that he had been seeking legal advice from an unidentified individual. During our telephone conversation on February 14, 2019, Heller was invited to bring this individual he had been communicating with to an interview. Heller explained that this individual was not an attorney, but a prison worker in California; therefore, that individual could not be physically present for an interview due to geographical separation.

29. During an interview with the pastor of the church attended by MINOR 1 and Heller (hereinafter PASTOR), I was made aware that Heller had two sisters, one in Colorado, Harmony Kilgore, and one in California, believed but not confirmed to be Rainbow Heller (hereinafter Rainbow) based on Lexis Nexis Accurint and social media queries. PASTOR was present for the January 16, 2019 meeting with Heller and other parties. PASTOR advised that this other sister, believed to be employed by the Bureau of Prisons in or near Sacramento, California, had told Heller that he should avoid federal prison as other inmates sometimes killed individuals accused of sexually assaulting minors. I believe based on this information that Heller's purported legal adviser was Rainbow. Due to Rainbow's physical location in California, I believe it is reasonable that any communication between Heller and Rainbow would have occurred by use of a cellular telephone, namely the Device.

**Attempted Service of Search Warrant**

30. On March 26, 2019, the Honorable United States Magistrate Judge Scott Varholak issued a search warrant for the seizure and search of the Device; however, while attempting to serve that search warrant I was unable to locate Heller. On March 28, 2019, I called Heller at telephone number 720-484-7854, and Heller answered. During this conversation, Heller explained that he was in California working on a home. Heller advised that he would be in California for approximately the next couple weeks and that he had driven to California.

31. As neither Heller nor the Device were in the District of Colorado during the authorized period to serve the search warrant issued March 26, 2019, it was unexecuted.

32. On April 14, 2019, and other dates, I conducted a spot check at 569 Ten Gallon Drive, Berthoud, Colorado. This house belongs to Heller's mother, and it has been Heller's residence since he was

removed from a church owned property following the disclosure of sexual abuse. I saw a black Hyundai Tucson, Colorado license plate ROK-932, which is a disabled veteran plate and registered to Heller. Heller is an Air Force veteran.

## SEIZURE AND SEARCH OF CELLULAR TELEPHONES

33. Some of the electronic records located on the Device might take the form of text messages, chats, photographs, files, documents, and other data that is user-generated. Some of these electronic records, as explained below, might take a form that becomes meaningful only upon forensic analysis. They may be seized and searched on-scene, and/or searched off-scene in a controlled environment.

34. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium, such as a cellular telephone's internal memory, can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer or cellular device, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

35. Also, again based on my training and experience, wholly apart from user-generated files, electronic storage media contain electronic evidence of how a device has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information. Data on the storage medium not currently associated with any file can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. File systems can record information about the dates files were created and the sequence in which they were created.

36. As further described in Attachment B, this application seeks permission to locate not only files that might serve as direct evidence of the crime described on the warrant, but also for evidence that establishes how the Device was used, why it was used, the purpose of its use, and the purposes to which it was put, who used it, the state of mind of the user, and when it was used.

37. In cases like this one, where the evidence consists partly of graphic files and electronic messages, the analyst needs all assisting software (operating systems or interfaces) and any applications software, which may have been used to create the data.

38. "User attribution" evidence can also be found on the Device and is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant

messaging logs, photographs, videos, and correspondence (and the data associated with the foregoing, such as file creation and last accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent, knowledge, and other evidence relevant to the crime under investigation.

39. Based upon my knowledge, training and experience, I know that a thorough search for information stored in digital storage media requires a variety of techniques that often includes both on-site seizure and search as well as a more thorough review off-site review in a controlled environment. This variety of techniques is required, and often agents must seize most or all storage media to be searched on-scene and/or later in a controlled environment.  These techniques are often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.

40. The search procedure of the Device may include off-site techniques since it is often necessary that such Devices be seized and examined off-site and in a controlled environment.  This is true because of the following:

   A. The nature of evidence.  As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how, when and why a device has been used, by whom, what it has been used for, requires considerable time, and taking that much time on premises could be unreasonable.  Searching for and attempting to recover any deleted, hidden, or encrypted data may be required to determine whether data falls within the list of items to be seized as set forth herein (for example, data that is encrypted and unreadable may not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of child exploitation offenses).

   B. The volume of evidence and time required for an examination.  Storage media can store the equivalent of millions of pages of information. Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names.  This may require searching authorities to peruse all the stored data to determine which particular files are evidence or instrumentalities of crime.  Analyzing evidence of how a device has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Reviewing information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

   C. Technical requirements.  Cellular devices can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on-site.

However, taking the media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

41. Based on the foregoing, and consistent with Rule 41(e)(2)(B), when persons executing the warrant conclude that it would be impractical to review the media on-site, the warrant I am applying permits off-site imaging and searching of media that reasonably appear to contain some or all of the evidence described in the warrant, thus permitting its later and perhaps repeated examination consistent with the warrant. The examination may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the Device's electronic storage to human inspection in order to determine whether it is evidence described by the warrant.

42. I know from training and experience that digital storage devices can be very large in capacity, yet very small in physical size. Additionally, I know from training and experience that those who are in possession of cellular telephones tend to keep them on their persons, especially when they may contain contraband or other evidence of a crime.

43. As discussed below, the Device is an Apple product that may be locked at the time of seizure. I am aware that "Touch ID" has been utilized on Apple iPhones since the release of the iPhone 5s in 2013, and current generation iPhones are equipped with Touch ID. A Touch ID sensor, a round button on the iPhone or iPad, can recognize fingerprints. The fingerprints authorized to access the particular device are a part of the security settings of the device and will allow access to the device in lieu of entering a numerical passcode or longer alpha-numerical password, whichever the device is configured by the user to require. The Touch ID feature only permits up to five attempts with a fingerprint before the device will require the user to enter a passcode. Furthermore, if the device is equipped with an operating system that is earlier than version 9.3, the Touch ID feature will not substitute for the use of a passcode or password if more than 48 hours have passed since the device has been unlocked; in other words, if more than 48 hours have passed since the device was accessed, the device will require the passcode or password programmed by the user and will not allow access to the device based on a fingerprint alone. If the operating system is version 9.3 or later, that time frame shrinks to 8 hours. Similarly, Touch ID will not allow access if the device has been turned on or restarted, if the device has received a remote lock command, or if five attempts to match a fingerprint have been unsuccessful. For these reasons, it is necessary to use the fingerprints and thumbprints of any device's user to attempt to gain access to the Device while executing the search warrant. The government may not be able to obtain the contents of the Device if those fingerprints are not used to access the Apple devices by depressing them against the Touch ID button. Although I do not know which of the ten finger or fingers are authorized to access on any given Apple device and only five attempts are permitted, I know based on my training and experience that it is common for people to use one of their thumbs or index fingers for Touch ID, and in any event all that would result from successive failed attempts is the requirement to use the authorized passcode or password.

**APPLE ICLOUD**

44. Apple is a United States company that produces iPhones, which utilizes the iOS operating system, computers and other electronic devices.

45. Apple provides a variety of services that can be accessed from Apple devices or, in some cases, other devices via web browsers or mobile and desktop applications ("apps"). As described in further detail below, the services include instant messaging and file storage.

46. iMessage and FaceTime allow users of Apple devices to communicate in real-time. iMessage enables users of Apple devices to exchange instant messages ("iMessages") containing text, photos, videos, locations, and contacts, while FaceTime enables those users to conduct video calls.

47. iCloud is a file hosting, storage, and sharing service provided by Apple. iCloud can be utilized through numerous iCloud-connected services and can also be used to store iOS device backups and data associated with third-party apps. It can be accessed using non Apple email addresses.

48. Apple services are accessed through the use of an "Apple ID," an account created during the setup of an Apple device or through the iTunes or iCloud services. A single Apple ID can be linked to multiple Apple services and devices, serving as a central authentication and syncing mechanism.

49. Apple captures information associated with the creation and use of an Apple ID. During the creation of an Apple ID, the user must provide basic personal information including the user's full name, physical address, and telephone numbers. In addition, Apple captures the date on which the account was created, the length of service, records of log-in times and durations, the types of service utilized, the status ¬¬of the account (including whether the account is inactive or closed), the methods used to connect to and utilize the account, the Internet Protocol address ("IP address") used to register and access the account, and other log files that reflect usage of the account. Apple does not usually verify the user-provided information.

50. Apple also maintains information about the devices associated with an Apple ID. When a user activates or upgrades an iOS device, Apple captures and retains the user's IP address and identifiers such as the Integrated Circuit Card ID number ("ICCID"), which is the serial number of the device's SIM card. Similarly, the telephone number of a user's iPhone is linked to an Apple ID when the user signs in to FaceTime or iMessage. Apple also may maintain records of other device identifiers, including the Media Access Control address ("MAC address"), the unique device identifier ("UDID"), and the serial number.

51. Apple provides users with five gigabytes of free electronic space on iCloud, and users can purchase additional storage space. That storage space, located on servers controlled by Apple, can be used to store iOS device backups, which can contain a user's photos and videos, iMessages, Short Message Service ("SMS") and Multimedia Messaging Service ("MMS") messages, voicemail messages, call history, contacts, calendar events, reminders, notes, app data and settings, and other data. Records and data associated with third-party apps may also be stored on iCloud; for example, the iOS app for WhatsApp, an instant messaging service, can be configured to regularly back up a user's instant messages on iCloud. Some of this data is stored on Apple's servers in an encrypted form but can nonetheless be decrypted by Apple.

**Preservation of Evidence**

52. As previously explained, Apple provides customers a means to preserve specific content stored on their devices through an iCloud account, and this content may include the content of iMessages, SMS, MMS, voicemails and some other communication applications potentially utilized by the Device user.

53. If and when an Apple user upgrades to a new Apple product, this content, stored via iCloud, can be transferred to the new Device if the user sets up the new device using their Apple ID. This simplifies the process of transferring potentially voluminous content, such as videos, photographs, contact numbers, messages and other data from an old device to a new device.

54. While I do not have information at this time indicating that Heller purchased a new cellular telephone between April 3, 2017 and the present time, even if he had, items sought and defined in Attachment B may have been transferred from any older device to a new device currently in Heller's possession via iCloud.

55. On March 15, 2019, I served a 2703(f) preservation request for iCloud data associated with Heller's account in order to preserve data stored on iCloud. Apple confirmed receipt and compliance with this request on March 21, 2019.

**CONCLUSION**

56. Through training and experience, as well as based on what has been described above, I believe that Heller has utilized the Device to speak with no fewer than four people about potential criminal violations. While some of these individuals have been cooperative and voluntarily provided the content of their communications with Heller, certain parties, such as Heller's sisters, have demonstrated that they will not be cooperative with this investigation or voluntarily submit content relevant to this investigation.

57. Heller was observed by law enforcement to utilize telephone number 720-484-7854 as recently as March 28, 2019, and Heller's vehicle has been observed at Suspect Residence as recently as May 6, 2019.

58. Based on the foregoing, I respectfully submit that probable cause exists that text messages, voice messages or other information relevant to conversations between Heller and others regarding the alleged violation of Title 18, United States Code, Section 2244(b) will be present on Heller's telephone even if he has taken steps to delete such content or records.

59. I also respectfully submit that based on my telephonic communications with Heller, in which he communicated with me using the Device at different times of day to include morning and evening, and based on my personal and professional experience and observations that people generally maintain their cellular telephones on or near their person, that probable cause exists to search Heller's person and/or the Subject Residence if Heller is determined to be located in the Subject Residence at the time of execution. I and other searching agents will attempt to secure the Device from Heller's person or his immediate surroundings, and if necessary, from any place in the Subject Residence where the Device is located. Upon locating the Device, it will be seized and the search will be suspended.

60. Based on the investigation described above, probable cause exists to believe that inside the Device (described on Attachment A2), will be found evidence, fruits, and instrumentalities of a violation of Title 18, United States Code, Section 2244(b) (described on Attachment B). I, therefore, respectfully request that the attached warrant be issued authorizing the search and seizure of the item described in Attachments A1 and A2 for the items listed in Attachment B.

I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge, and belief.

*s/Philip R Jones*___________________
Philip R. Jones
Special Agent, FBI

SUBSCRIBED and SWORN before me this _6th__ day of May, 2019.

_______________________________
UNITED STATES MAGISTRATE JUDGE

Application for search warrant was reviewed and is submitted by Patricia Davies, Assistant United States Attorney.